THE STATE, DEFENDANT IN ERROR, v. THE LACKAWANNA RAILROAD COMPANY OF NEW JERSEY, PLAINTIFF IN ERROR.

Argued November 27, 1912—Decided March 3, 1913.

1. A right of way for a railroad was crossed by a public road over which the railroad was carried by a bridge that rested upon abutments erected on the side lines of the public road, which was thereby narrowed at the point of crossing from its lawful width of thirty-three feet to an actual width of twenty-four feet. Upon the trial of an indictment of the railroad company for maintaining a nuisance in the public highway, the company offered to show that the passage so constructed was of a width and character suitable to the locality. *Held*, that it was error to refuse such evidence.

2. A railroad company under the twenty-sixth section of the General Railroad law is not required to span the entire width of a public road that it crosses by an overhead bridge, provided it constructs and maintains a passage of a width and character suitable to the locality.

3. The provisions of the twenty-sixth section of the General Railroad law are not restricted in their application to cases in which a grade crossing has previously existed.

4. The case of *Township of Raritan* v. *Port Reading Railroad Co.*, 4 *Dick. Ch. Rep.* 11, explained and its *dictum* disapproved.

On error to the Supreme Court.

For the plaintiff in error, *Maximilian M. Stallman* and *Gilbert Collins*.

For the defendant in error, *Henry Huston*.

The opinion of the court was delivered by

GARRISON, J. The Lackawanna Railroad Company of New Jersey was indicted and convicted for maintaining a nuisance in a public street in the borough of Andover by erecting in said street the abutments for an overhead bridge by which its tracks were carried over and across such public road. These abutments were erected in the public road and encroached upon each side of it to the extent of four and one-half feet, thereby reducing the road from its legal width of thirty-three feet to an actual width of twenty-four feet. These facts having been shown by the state and not controverted by the defendant, its counsel offered in its defence to prove the number of vehicles that used the public road at this point and other facts tending to show that the passage constructed beneath the bridge and between the abutments was of a width and character suitable to the locality, and that the travel on such road would be in no way impeded. This defence was made upon the theory that such was the measure of the defendant's statutory duty under the twenty-sixth section of the General Railroad law, and that if it had performed its statutory duty it could not be guilty of maintaining a nuisance.

The trial judge, conceiving that it was the duty of the defendant to bridge the entire width of the highway, refused to admit the testimony and charged the jury in effect that their verdict must be against the defendant.

The legal question, which is the construction of the statute, is presented by the exception allowed to the overruling of this testimony, so that with respect to the question whether the charge amounted to a direction of a verdict nothing need be added to what was said by this court in an earlier *per curiam.* The judgment of the Sessions was taken to the Supreme Court upon writ of error and was there affirmed, the opinion being delivered by the Chief Justice. *State* v. *Lackawanna Railroad Co.*, 52 *Vroom* 181.

The Chief Justice, after stating in this opinion that the right of a railroad company by virtue of the twenty-sixth section of the General Railroad law to narrow a public road, at the point where it crosses, by placing upon the sides of such public road the abutments of the bridge that carried the railway over it had not been passed upon by the law courts of this state, but had been decided adversely to such right by the Court of Chancery, conceived it to be his duty to follow the construction thus placed upon the statute by the court of equity, and upon that ground a judgment affirming the defendant's conviction was rendered. The equity case thus referred to and followed was *Township of Raritan* v. *Port Reading Railroad Co.*, 4 *Dick. Ch. Rep.* 11, in which Chancellor McGill held that "when the railroad is so built as to cross a highway above its grade it must bridge the entire width of the highway." The judgment of the Supreme Court then came to this court upon a writ of error and was affirmed for the reasons stated by the Chief Justice. *State* v. *Lackawanna Railroad Co.*, 53 *Vroom* 747.

A reargument was afterwards ordered upon which the entire case has been re-examined with particular reference to the authority upon which the judgment of the court below was founded, with the result that we disapprove of the construction placed upon the General Railroad act in the equity

case that was followed by the Supreme Court and think that that court committed error in the judgment that it rendered.

In the first place, what Chancellor McGill said in the Raritan case was clearly *obiter dictum*, for, while the facts of the case squarely presented the question, the decision of the court was, just as squarely, placed upon the ground of a lack of jurisdiction to pass upon the question so presented. The rule for an injunction was discharged by the Chancellor because "the remedy by indictment was sufficient to abate the nuisance and to restore to the public use the entire highway," and in such case "equity will not exercise its jurisdiction."

What the Chancellor said therefore concerning the General Railroad law was an expression of opinion upon a matter that was avowedly not within the jurisdiction that he was exercising, and hence had not the force of judicial decision, although it is, of course, entitled to respectful consideration as the view of a careful and learned judge.

Vice Chancellor Stevenson was therefore quite right when in his opinion in *South Amboy* v. *Pennsylvania Railroad Co.,* 6 *Buch.* 57, 66, he characterized this view as "the doctrine laid down by Chancellor McGill I think by way of *dictum* when the case is carefully analyzed."

This criticism is the more significant because Vice Chancellor Pitney, in the case of *Borough of Metuchen* v. *Pennsylvania Railroad Co.,* 1 *Buch.* 404, 416, had endeavored to sustain the Chancellor's opinion as judicial decision upon the hypothesis that he did not mean what he said, a process not lightly to be applied to the language of as precise a writer as Chancellor McGill.

We agree with Vice Chancellor Stevenson that in the Raritan case the doctrine was the *dictum*, and that the decision was solely as to jurisdiction.

While, therefore, the precise question raised on this writ of error is *res nova*, the same statutory provision in its essential features has been repeatedly before our courts, notably in *State* v. *Central Railroad Co.,* 3 *Vroom* 220, and in *Metuchen* v. *Pennsylvania Railroad Co.,* 3 *Buch.* 359. The first of these

cases established the right of the railroad company to alter the grade of a public road, and also held that the duty of providing a sufficient passageway was a continuing one, to be measured by circumstances as they arose, which is a complete answer to so much of Chancellor McGill's argument as was based upon the notion of a permanent occupation of the highway. Permanency in this connection must mean legal not structural permanence, and there can be no legal permanence about a structure however massive or expensive that may any day have to be removed to meet the exigencies of local public travel.

The Metuchen case in this court reversed the decree advised by Vice Chancellor Pitney in the Court of Chancery and reaffirmed the earlier Supreme Court decision; the reference in the opinion of Chief Justice Gummere to the question now before us, but not then before the court for decision, was a mere concession *arguendo* to the view that had been expressed by the court below and there supported by the *dictum* of Chancellor McGill.

Inasmuch, however, as the view thus hinted at is the precise proposition for which the defendant in error now contends, it will be well to quote what was said in the opinion, viz.:

"It may well be that when a railroad company builds its railroad over an existing public road so high above the level thereof as not to interfere with public travel thereon, such a charter provision as that appealed to confers upon it no right to encroach upon the limits of such road with its abutments or with supports for its tracks; but when the tracks of a railroad company have been laid across a public highway at grade and increasing travel eventually requires the abandoning of the grade crossing for the better conserving of the safety of those using the highway, the right of the company under such a charter provision to construct a passageway under its railroad, as it then exists, of sufficient width and height to accommodate public travel * * * is clear." Citing Township of Raritan *v.* Port Reading Railroad Co. and quoting as follows from Chancellor McGill's opinion therein: "The duty

imposed is: "To provide a substitute for that which is necessarily and lawfully taken away, and the law requires no more than that such substitute shall be sufficient to accommodate public travel at its location.' "

The trouble with this view—and in meeting it we are meeting the whole contention of the defendant in error—is that it reads into the statute words that are not there and reads out of the statute words that are there. There is nothing in the statute about "abandonment of grade crossings" or the "providing of a substitute." The statute deals with three simple elements, viz., a right of way for a railroad, the crossing of a public road and the duty to construct a suitable passageway. To strike the words "to construct" out of this statute and to write in the words "to substitute," is to make a totally different statute.

Originally, of course, all such constructions were substitutions, for the simple reason that in the early days of railroading all crossings were at first grade crossings, but this state of fact did not alter the meaning of the words of the statute, so that now when the facts are different their plain meaning cannot be given to them. The notion of the substitution of an overhead for a previously existing grade crossing had its inception in the facts to which the statute was first applied, not in the language of the statute, and as to "necessity," there is always a necessity for legislative regulation of the manner in which one public highway shall cross another, and that is what this statute undertakes to do without expressing or implying any distinction based upon the pre-existence or the non-existence of a grade crossing.

The bare idea that if a railroad is laid at grade and then elevated, it would thereby gain rights that it would not have if the latter mode of crossing had been first adopted, suggests at once that such an absurd conclusion must rest upon a fallacy in either the premises or the reasoning that leads to it. The fallacy is that the statute is not restricted to substituted crossings, but applies to original construction as well.

Let us see just what the statutory language is and how it

has become so. In the General Railroad law of 1873 (*Pamph. L., p.* 88) the language of section 14 is: "It shall be the duty of any company incorporated under this act to construct and keep in repair good and sufficient bridges and passages over, under and across the said railroad when any public or other road now or hereafter laid shall cross the same so that the passage of carriages, horses and cattle on the said road shall not be impeded thereby."

By the supplement of 1882 (*Pamph. L., p.* 245) this language was amended in two important particulars that must be read in the light of their concurrent adoption—*first,* the railroad company is described as any company owning a right of way *for* a railroad, and *second,* a proviso is made that the bridges and passages where such a right of way is crossed by a public road "shall be of such width and character as shall be suitable to the locality where the same are situated," both of which provisions are retained by the present revision of the General Railroad law, where they appear as section 26. *Comp. Stat., p.* 4231.

The description "right of way *for* a railroad" is broad enough to cover original construction as well as substituted elevation, and is therefore most significant as tending to show that the statutory provision was not restricted to the latter case only, *i. e.,* to the right of way *of* a railroad; the other provision, which was coupled with the foregoing, effects a modification of the common law that is co-extensive with the scope of the statute, so that we are not concerned with the common law authorities that are relied upon or with common law principles, but solely with the meaning and effect of the legislative language.

Taking the legislative language as it stands, and in view of its history, and starting with the assumption that it imposes the duties and confers the rights that have already been declared by judicial decision, there is nothing in the language of the statute that limits such rights and duties to those cases only in which a grade crossing has once existed and been abandoned. There is nothing in the legislative language to

suggest that the pre-existence of such a crossing is a condition precedent to the application of the statute. The common law is modified by the statute wherever a right of way for a railroad is crossed by a public road and a suitable passageway is constructed, and any additional conditions or limitations are without legislative sanction. What the legislature was considering was not the past history of the railroad company but its present purposes; not where its tracks had been placed but where they were going to be put. It would be indeed most unfortunate in this day of rapidly-running trains and dense population if the railroads should by force of our decision be induced, almost compelled to resort to grade crossings in the first instance in order to obtain afterwards the practical benefits of a substituted overhead crossing denied to them in case they originally constructed their roadway with such regard for public safety. Fortunately, such an anomalous situation is not created by the statute.

Every inducement, and every intendment, legislative and judicial, that has led to the enactment, amendment and construction of this statutory provision in its application to the substitution of overhead for grade crossings applies with equal cogency to the original avoidance of such crossings. The essential features, which are the crossing of two public highways and the narrowing of one of them at the point of juncture from its legal to its practical width, rest in each case upon precisely the same policy and the same custom. The policy in either case regards public safety, and the custom that is thus recognized is that the traveled portion of public roads is rarely co-extensive with their lawful width. The use of the rest of the road, *i. e.,* its sides, for the tying of teams, the laying up of vehicles, the delivery of goods and other customary uses is, by the policy in question, intermitted for the few feet more or less, where by reason of the elevated or depressed railroad crossing, the highway is narrowed down from its theoretical to its practical width.

The statute, therefore, applied to the plaintiff in error, and if at the trial it could have satisfied the jury that the passage it had constructed was of a width and character suitable to

the locality, it was not guilty of maintaining a nuisance. It was error, therefore, to refuse to admit the testimony that was offered, and for this reason the judgment of the Supreme Court is reversed in order that there may be a *venire de novo.*

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, GARRISON, SWAYZE, BERGEN, MINTURN, KALISCH, BOGERT, VREDENBURGH, CONGDON, TREACY, JJ. 10.